MOEEL LAH FAKHOURY LLP
Shaffy Moeel (State Bar No. 238732)
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone: (510) 500-9994
Email: shaffy@mlf-llp.com

Attorneys for Yeny Fernandez Reyes

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>YENY FERNANDEZ REYES,<br><br>Defendant. | **Case No.:** 21-CR-250-YGR<br>22-CR-178-YGR<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:** Courtroom 1, 4th Floor<br>**Hearing Date:** June 29, 2023<br>**Hearing Time:** 9:00 a.m. |

## STATEMENT OF FACTS

### A. Ms. Fernandez's History and Characteristics.

Yeny Fernandez was born in Santa Barbara, Honduras and lived there until she was nine years old. Her family home was a one room dwelling made of adobe and sheet metal where she and her family slept on the floor. Meals consisted of tortillas and either rice, beans, or an egg. Yeny recalls that their most enjoyable meal was a soup with tripe, the only meat she ate given her family's impoverished circumstances. With her mother selling tortillas and her father working as a shoe shiner, the family could not afford the bare minimum, making it essential for Yeny to work. Starting at the age of six, Yeny woke up each day at 2:00 in the morning to make tortillas to sell at an outdoor market alongside her mother. Naturally, this schedule kept her from going to school. Even with Yeny working, her family depended on donated clothing and food baskets containing spaghetti and rice to help supplement their food. On birthdays, Yeny was grateful to be enrolled in a program that sponsored a small cake, a plate of food, and a swimming pool outing, the best day of the year for her.

Throughout Yeny's early childhood she experienced both physical abuse and domestic violence at the hands of her alcoholic father. Yeny described how her father violently hit her mother, threw cookware, and beat Yeny with cables while under the influence of alcohol. His beatings and rages were so regular that her mother developed a getaway plan whenever she heard Yeny's father's belligerent and menacing yells as he approached their home. Within minutes of hearing him, her mother grabbed the children, a blanket, and retreated to a nearby hillside where they waited for hours at a time, sometimes falling asleep, until their mother deemed it safe to return because their father was asleep.

When she was nine years old, Yeny experienced additional trauma when she was attacked by her father while she was asleep. Yeny described this assault in further detail in her pre-sentence report[1].

---

[1] To protect her privacy, counsel will not repeat details regarding that assault in this public filing.

DEFENDANT'S SENTENCING MEMORANDUM,
*United States v. Fernandez*, 3:21-CR-00136-CRB

1

Yeny's father was subsequently arrested and jailed for approximately six months. During his incarceration his conduct was minimized by family and community members who pressured Yeny to denounce his imprisonment. Afraid of living with her father again and without her family's support, a nine-year-old Yeny pleaded with a local girl and her mother to take her in upon her father's release. From age nine to twelve Yeny lived with this family. Although estranged from her father, she was in contact with her mother with whom she continued to sell tortillas and shared her earnings.

When she was just twelve years old, Yeny met Faisal Pineda Sagastume Pineda, who encouraged her to run off with him so that she could improve her socioeconomic condition. A year later, at thirteen, Yeny learned that she was pregnant and moved in with Faisal and his family. Yeny reported being mistreated by Faisal's mother who yelled and criticized Yeny for not knowing how to cook and not washing clothing and the dishes to the mother's liking. Along with the verbal abuse of Faisal's mother, Yeny was physically abused by Faisal who beat her regularly with no interference from his family. After months of withstanding Faisal's abuse, Yeny left his home without warning and rented a room in Santa Barbara where she worked selling coffee, pastries, and drinks.

Shortly after her move, Yeny experienced pains in her belly and was admitted to the hospital where hospital staff berated her for being young and pregnant. When she was told she required a cesarean, she cried, uninformed of the procedure and in fear of both her and her child's life. On the day that her son Anderson (now 13) was born, Yeny was fourteen and alone in the hospital.

Once she returned to her small apartment, alone with newborn Anderson, Yeny's mother secretly visited Yeny and brought her soup while Yeny's father was at work. Yeny recalled the fear of not knowing how to soothe her child and the relief she felt upon seeing her mother who embraced her in tears and held her child. Eventually learning of Anderson's birth, Faisal promised to change and suggested that Yeny return to his family home. Struggling to provide for herself and her newborn, Yeny

relented. Initially, Yeny felt an improvement in the family and relationship dynamics. However, this was short-lived and devolved into continued abuse and manipulation that centered around her child, with Faisal and his family threatening that if she left, Anderson would remain in their custody due to her young age and limited resources. Yeny believed their threats and remained in the relationship. Eventually, Yeny was resigned to accept her life with Faisal, believing it was her best option, and went on to have her daughter, Karina (now 7).

Not long after Karina was born, Yeny became pregnant with her third child. This child died just days after he was born due to complications related to an infection, described in further detail in her presentence report. Her baby's death is a defining moment of trauma in Yeny's life, launching her deep into a depression from which she continues to try and emerge.

By June of 2019, the trauma of losing her infant and the years of abuse with Faisal led Yeny to decide that her only chance at a decent life was if she could immigrate to the United States. Having secretly saved enough money to cover bus and train fair, Yeny made the long and rough trek to the United States with her daughter in tow, alone and absent the help of a guide. Meanwhile, Anderson was left in the care of her mother-in-law who encouraged Yeny's departure because she by then recognized and apologized for Faisal's abuse and her own maltreatment of Yeny.

Yeny's migration north was a brutal and traumatic experience. She travelled by bus, train, and on foot, often running for her life while carrying her daughter. She was robbed of her money and phone by masked gunmen, suffered hunger, unsafe sleeping conditions, witnessed violence inflicted on other migrants, and faced numerous physical obstacles amplified by having to carry her daughter who grew sick with a fever. At times these circumstances were so difficult she considered giving up and returning home, only to be encouraged by a woman she met along the way, to continue forward until she reached the United States. Yeny described this woman as an angel who gave her strength when she wanted to

give up. Both this encouragement and Yeny's resolute desire to improve her living conditions and opportunities for her children propelled her forward to the United States.

In the United States, Yeny lived with Faisal's brother and worked a temporary job at a packaging warehouse. Faisal's brother lost his apartment and suddenly Yeny and her daughter were left homeless. She needed to earn money and fast in order to put a roof over their head. By this point, she had met her co-defendant Mr. Cruz-Calix. Driven by economic pressures, Yeny succumbed to Mario's suggestion to sell drugs for quick money, departing from her primary goal of creating a legitimate and admirable life for herself and her children. Yeny regrettably looks back on her decision to sell drugs and reflects on the missed opportunity to improve her family's life circumstances, and the profound negative impact it has had on both her and her children's lives, a series of mistakes she now readily acknowledges.

## SENTENCING ARGUMENT

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the U.S. Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

Ms. Fernandez's plea agreement allows her to request a sentencing variance pursuant to 18 U.S.C. § 3553. She respectfully requests that the Court sentence her to 18 months custody to be followed by 3 years of supervised release.

A. **Seriousness of the Offense, Respect for the Law and Just Punishment.**

The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the offense," the need "to promote respect for the law" and "provide just punishment for the offense"— are the sentencing rationale of "retribution." *See Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a term of supervised release") (emphasis omitted). "The goal of retribution" is the "interest[] in seeing that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008). Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

An 18-month sentence is a significant prison sentence, particularly for someone who has never served any other period of time in confinement. And particularly for a parent whose confinement has separated them from their young child.

Moreover, an 18-month sentence also accounts for the "real conduct and circumstances" in this case, which as the probation office itself notes includes Ms. Fernandez's traumatic upbringing, the abuse she suffered into adulthood, her lack of criminal convictions, and alcohol dependency. PSR p. 32. Trauma during childhood creates higher risks for negative outcomes in life, including health and life opportunities.[2] Supportive and nurturing relationships and environments for children and families are at the "heart of prevention" for children with trauma history. *Id.* Ms. Fernandez certainly did not have that kind of childhood.

It is unsurprising that Ms. Fernandez has found herself incarcerated. There can be no question that Ms. Fernandez's troubles, caused by her traumatic past and exacerbated by alcohol abuse in order to deal with the impact of long-lasting trauma, contributed to his poor judgment in this case. As told to the *New York Times*, "in a justice system built upon the idea of choice and personal

---

[2] *See* Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019, https://www.npr.org/sections/health-shots/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it.

responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions."[3] It is often repeated by prosecutors that childhood trauma is not an excuse for an adult's behavior, dismissing years of neglect inflicted upon a helpless child because a grown man has had plenty of time to decide what type of adult he should be. However, childhood trauma does not have an expiration date. Indeed, as one Cornell University sociologist told the *New York Times,* trauma is a major factor "that shapes addictive and criminal behavior in adulthood" and is a "huge factor within the criminal justice system."[4] As a doctor with the Centers for Disease Control elaborated, "children's adverse experiences are a public health problem" as "childhood adversity and stress can chemically change the way our brains work."[5]

Ms. Fernandez accepts responsibility for the mistakes and harmful impact to our community that she caused, any sentence must take her childhood adversity into account.

An 18-month sentence is also justified by the fact that being in jail has been, and will continue to be, significantly more difficult due to the COVID-19 pandemic. COVID-19 has wreaked havoc in prisons and jails across the country including the San Francisco County jail, Santa Rita jail and the BOP. One study has found that the COVID-19 confirmed case rate in prison is 3.7 times higher than the national rate, and the death rate was two times the number expected given mortality among individuals of a similar age, gender, and race.[6] In an effort to control the spread of the disease, jails have held inmates under lockdown conditions like solitary confinement and restricted physical visits. Because COVID-19 has made the time Ms. Fernandez has served—and will continue to serve—more severe than it would be otherwise, a variance from the Guideline range is warranted.

---

[3] *See* Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017, https://www.nytimes.com/2017/10/15/us/childhood-trauma-prison-addiction.html.

[4] *Id.*

[5] *Id.*

[6] *See* National Commission on COVID-19 and Criminal Justice, "COVID-19 in U.S. State and Federal Prisons, December 2020 Update," at 3, *available at* https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/COVID-19_in_State_and_Federa.pdf.

**B.     Deterring Criminal Conduct and Protecting the Public.**

An 18-month custodial sentence will deter Ms. Fernandez from selling drugs. This sentence is the only custodial sentence Ms. Fernandez has ever served, and it is significant. Furthermore, Ms. Fernandez will undoubtedly be deported upon her release from custody.

**C.     The Guidelines Sentencing Range.**

   **1.     The Plea Agreement Guidelines Range.**

Ms. Fernandez agrees with the Guideline calculations in the plea agreements and as reflected in the PSR. The resulting offense level, when taking into account a departure for "global resolution" pursuant to §5K2.0(a)(2)(B), is 21.  The advisory Guideline range is 37-46 months.

On April 5, 2023, the U.S. Sentencing Commission ("U.S.S.C.") approved preliminary amendments to the Guidelines which will go into effect on November 1, 2023, absent Congressional disapproval. Within those preliminary Amendments is a new Guideline, U.S.S.G. § 4C1.1, which states for defendants with zero criminal history points meeting certain criteria, the district court should "decrease the offense level determined under Chapter Two and Three by 2 levels." The amendment also changes the commentary to U.S.S.G. § 5C1.1 to state that defendants receiving an adjustment under U.S.S.G. § 4C1.1 whose Guideline ranges are not in Zones A and B of the Sentencing Table may nonetheless receive "a sentence other than a sentence of imprisonment" if the "the defendant's applicable Guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." Ms. Fernandez meets the criteria for a two-level decrease promulgated in proposed U.S.S.G. § 4C1.1(a).  She has no criminal history points and did not use threats of violence; the offense did not result in death or injury, is not a sex offense, did not cause "substantial financial hardship," did not involve weapons or a violation of individual rights under U.S.S.G. § 2H1.1, and Ms. Fernandez did not receive any upward adjustments under Chapter 3 of the Guidelines. Thus, if Ms. Fernandez were sentenced after November 1, 2023, the resulting offense level for the same exact conduct would decrease from 23 to 21, and the advisory Guideline range would decrease from 30-37 months under the Sentencing Guidelines.

   **2.     Regardless of the Guideline Range, a Variance is Warranted**

Even if the Court were to adopt the parties' guideline calculations and the advisory range of 30-

37 months, a further variance to 18 months is warranted.

First, an 18-month sentence is a significant sentence to account for the seriousness of Ms. Fernandez's conduct and Ms. Fernandez has been specifically deterred.

Secondly, Ms. Fernandez will face the additional consequence of certain deportation from the United States. Given that her son Anderson and daughter Karina continue to reside in the United States, this consequence is significant. Ms. Fernandez will have to decide whether to continue to allow her children to live in this country without her or return them to Honduras to live with her, thereby negating all of the sacrifices that she made to bring them here for a better future. In many ways, Ms. Fernandez has hard days ahead of her where she will have to face hard parenting questions and economic uncertainty. But what has changed for her is a new growth-oriented perspective about her life. Ms. Fernandez has learned English in the last 14 months that she has spent incarcerated at Santa Rita jail. Not only is this no simple feat but this significant accomplishment demonstrates her growth mentality and her determination to truly put in the work of creating a better life for herself.

Ms. Fernandez has made other efforts to demonstrate to herself and the Court that she has learned from her past mistakes. She has taken nearly every class available to her at Santa Rita Jail. She has sought out and maintained a job at the jail where she works as a pod worker, having earned the trust of the correctional officers and inmates alike.

Ms. Fernandez is ashamed of her past behavior. She will be the first to ask the Court—as a symbol and representative of the United States and our community—for forgiveness. She truly means it.

## **CONCLUSION**

Ms. Fernandez respectfully requests this Court sentence her to 18 months in custody.

| | |
|---|---|
| Dated: June 22, 2023 | Respectfully submitted, |
| | MOEEL LAH FAKHOURY LLP |
| | |
| | */s/ Shaffy Moeel* |
| | Attorneys for Ms. Fernandez |